J-A26044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| L.I.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.I.B. | : | |
| | : | |
| Appellant | : | No. 887 WDA 2019 |

Appeal from the Order Entered May 17, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD-17-4053-005

BEFORE:  SHOGAN, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 14, 2020**

J.I.B. ("Father") appeals from the custody order entered on May 17, 2019, which denied his petition to modify the existing custody order that was incorporated into Section 4 of the Marriage Settlement Agreement ("MSA"), dated February 15, 2017, between him and his former wife, L.I.B. ("Mother"), the mother of the parties' three children, J.B. (a female born in June 2008)[1]; B.B. (a male born in November 2010)[2]; and L.B. (a female born in January 2016) (collectively, "Children").  The trial court's May 17, 2019 order also directed that the MSA would continue to govern legal and physical custody between the parties and denied Father's request to relocate the Children from

---

[1] N.T., 10/10/18, at 40.

[2] N.T., 10/10/18, at 21.

Pittsburgh, Pennsylvania, where they currently reside with Mother, to Ballwin, Missouri, where Father is serving in the United States Marine Corps.[3, 4] We affirm.

The trial court set forth the factual background and procedural history of this appeal as follows:

> Father . . . and [M]other . . . are the parents of three minor children, [ten]-year-old [J.B.], [eight]-year-old [B.B.], and [three]-year-old [L.B.].
>
> The parties married [in November 2007], separated [in June 2016], and were divorced [in February 2017].
>
> * * *
>
> The parties' divorce papers, filed in St. Louis County, Missouri, incorporated [an MSA] and [a] parenting plan in which the parties agreed that [M]other would relocate with the three children to Pittsburgh, [Pennsylvania], where they have now resided, in a four-bedroom house in the West End, with [M]aternal [G]randmother [G.M.], and her husband, [S.M.]
>
> Father is a staff sergeant in the [United States] Marine Corps. He has served at duty locations in a number of states. He married [M.M.B. ("Step-Mother" or "Step Mom")] in the summer of 2018. She is employed as an escrow manager for a title company.
>
> In February [2019], [F]ather and [Step-Mother] moved to Ballwin, Missouri, where [F]ather has a special duty assignment as a canvassing recruiter. Father and [S]tep-[M]other live in a four-bedroom house.

---

[3] N.T., 5/16/19, at 23-24.

[4] The trial court assumed jurisdiction over the case by order dated April 27, 2018. *See* Trial Court Order, 5/17/19, at 1.

Prior to the move[,] [F]ather and [S]tep-[M]other resided near New Orleans, in Mandeville, Louisiana, for 18 months.

On May 10, 2018, [M]other filed a petition to modify the 2017 Missouri custody order. Father filed a cross-petition for primary physical custody on May 24, 2018.

At a judicial conciliation on August 27, 2018[,] the [trial court] set a December [2018] trial date, and it was agreed that the two older children would appear on October 10, 2018 for *in camera* interviews, to be recorded for use at trial. Those interviews are hereby incorporated into the trial record.

At the pre-trial conference on December 23, 2018[, M]other's counsel announced that [M]other was withdrawing her complaint for modification.

In consultation with counsel[,] the [trial court] ordered [F]ather to file a notice of proposed relocation that would be considered for trial with his cross petition for primary custody. . . .

The case went to trial on [F]ather's modification and relocation claims, starting [on] May 16, 2019. Father was represented by counsel[; M]other represent[ed] herself.

The parties themselves were the only witnesses at trial. However, as agreed upon, the *in camera* interviews of the [C]hildren were carried forward to this record.

N.T., 5/17/19, at 63-65.[5]

After the close of the testimony at the hearing on May 17, 2019, the trial court dictated its findings, conclusions, and order into the record. The trial court stated its findings as to the statutory best interest factors pursuant to 23 Pa.C.S. § 5328(a), as follows.

---

[5] At the hearing on October 10, 2018, the trial court interviewed B.B. and J.B., in open court, with Father's counsel present.

- 3 -

We begin with the custody factors. [Factor] 1, which party is more likely to encourage and permit frequent and continuing contact between the [C]hildren and the other party.

This factor promotes the best interest of the [C]hildren by measuring each parent's good faith effort to nurture and support the other parent's participation in the child's life.

The [trial court] finds that the pattern in this case is that each party accuses the other of interfering with regular, even court-ordered phone or video contact with the non-custodial parent, and the [trial court] finds that each party assumes the worst of each other.

This was demonstrated in the courtroom this morning[,] when [F]ather testified he assumed [M]other would not accommodate his request to see the [C]hildren during his present visit to Pittsburgh for the custody trial.

That's a tragedy, that he would be in Pittsburgh and not see the [C]hildren.

He made the same assumption, he testified, when he was here for the pre-trial.

Father has not once in more than [two] years sought to exercise the additional custody to which he is entitled during any month in which he does not otherwise have custody. That's in the marriage settlement agreement custody order.

He testified that he's aware that the [C]hildren have asked him to come to Pittsburgh for such visits, but no time in [two] years has his schedule allowed him to exercise that right, which he is granted in the controlling custody order.

The breakdown in communications between these parties is based in large part on [F]ather's distrust and presumption about how [M]other would respond to his requests.

In my interview with [J.B.,] she reported that she talks to [F]ather at least three times a week and that she actually enjoys the calls. The child told the [trial court] she is not always available

- 4 -

when [F]ather calls. She's a [ten]-year-old and she may be busy playing.

Father testified that when the [C]hildren are in his custody[,] he asks them if they want to speak with their [M]other. That doesn't seem the best route to ensure that [M]other gets phone calls while the kids are in [F]ather's custody.

Mother testified that [F]ather was inflexible at the Generations conciliation last summer when [M]other requested to modify the summer schedule for the [C]hildren to have some time with maternal great[-]grandparents, who visited from South Africa.

Distrust and resentment carries on from the parties' marriage and separation several years back. Unfortunately, the parties have not spared the [C]hildren from exposure to this distrust and resentment.

Factor 2, present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party.

It is undisputed that the Marines sent [F]ather to anger management classes, and that a military protective order was issued restraining [F]ather from contact with [M]other for some months after an altercation at the marital residence on December 17, 2014.

And [M]other testified that there was an earlier military restraining order entered against [F]ather when they resided in North Carolina in 2012 or 2013.

Regarding the 2014 order, [M]other and [F]ather disagreed about what started the argument; either [M]other spending $200 at Target, or [M]other finding lipstick and cigarettes in [F]ather's truck.

Mother testified that [F]ather beat her, punched her, pushed her down the stairs and choked her against a door, threw her cell phone. . . . [M]other hit [F]ather on the head with a candle stick. She admitted to that, leaving a gash in the back of his head and prompting an investigation of [M]other by the military.

Mother testified that[,] during the melee[,] [F]ather locked [J.B. and B.B.] in a bedroom. Mother summoned her sister to the house. Mother testified [F]ather[,] at the top of steps[,] got a handgun from the bedroom, cocked it and pointed it at the women at the bottom of the steps, telling them to get out.

Mother called [F]ather's command duty phone. The police arrived. Father spent the night in the St. Louis County jail.

Father[,] in his testimony[,] denied pointing the gun at the women or cocking it. He said he merely touched the firearm, which he said was on a TV stand in the bedroom.

Father said he was taken to jail after he failed to comply with orders from police officers to lower his voice. Father says he could not control his hostility.

Mother . . . testified that she found the gun the next day hidden behind a couch in the bedroom and turned it over to authorities.

In the spring of the next year, 2015, the protective order was terminated at the request of [M]other, which is stated in exhibit B. It says that the termination was so that the parties could finalize a divorce and fulfill custody arrangements for the [C]hildren.

However, the divorce did not proceed at that time. Rather, [L.B.] was conceived just a few weeks after the restraining order was lifted.

Mother and [F]ather did not finally separate until the summer of 2016, over a year later, and about a year and a half after the December 2014 incident.

Mother testified that [F]ather never laid hands on her again after this incident, but that mental abuse continued. She testified to two prior instances where she alleges that [F]ather pushed her or threw her against objects. She said that one of these instances in early 2014 was witnessed by [J.B. and B.B.].

Father denies the earlier incidents of abuse.

- 6 -

However, [M]other's testimony was undisputed that [F]ather told her at the time of separation that she had 30 days to get out of the house with the kids or the utilities would be cut off, an ultimatum that [M]other relayed to [F]ather's commanding officer.

Asked if he made this remark[,] [F]ather answered twice[, "I do not recall."]

[Factor] 3, the parental duties performed by each party on behalf of the child.

Mother has been the school-year parent since the parties' custody agreement was reached in early 2017 and the [C]hildren moved to Pittsburgh with her.

Father finds fault with [M]other's performance of the duties associated with being the primary school-year parent. He testified credibly to problems with the [C]hildren's diet, their unmonitored [Internet] usage, [and] their school attendance.

The evidence is that [M]other, even with the help of maternal grandparents, especially at first, upon her arrival in Pittsburgh, failed to perform satisfactorily in all of these areas on occasion.

The [trial court] finds that there is evidence that [M]other has improved in all of these areas in the more recent months that she's lived in Pittsburgh with the [C]hildren.

Father gives – in his laying blame on [M]other, gives no apparent consideration to the events that sent [M]other to Pittsburgh a little over [two] years ago, the undisputed evidence that [F]ather told her to get out with the [C]hildren, and that[,] in the marital settlement agreement[,] he consented to her moving to Pittsburgh with the [C]hildren.

Father, married since last summer to [S]tep-[M]other, testified that he can do better than [M]other has done during her initial years in Pittsburgh. He cites that he has a flexible schedule in his current job. That he has hours of 9:00 to 5:00, that there's minimal travel, and nothing that would take him outside the U.S., and nothing that would generally keep him away overnight, and

that [S]tep-[M]other has a flexible schedule as well and would be able to perform parental duties as well.

Factor 4, the need for stability and continuity in the child's education, family life, and community life.

Given the nature of [F]ather's military service[,] it is possible that [F]ather may be transferred to a new duty station at the conclusion of his [three]-year contract. The Marines could also elect to transfer him sooner than [three] years, despite the contract.

The kids have an established pattern, friends, neighbors, school, a support network in Pittsburgh.

[B.B.] is in second grade and has already been to three schools. [J.B.] is in fifth grade and has already been to four schools. Both have been in Westwood Elementary for the past [two] years, [B.B.] is excelling academically, if one can say that for a second grader.

[J.B.] had a socially tough year due to bullying, and her grades suffered. However, the [trial court] was favorably impressed with the school administration's handling of the bullying report once it was brought to their attention in a letter from [M]aternal [G]randmother at the beginning of December 2018.

Attendance has been an issue in the initial years after the [C]hildren arrived in Pittsburgh, and even before, while they were living in the south. But records produced today by [M]other suggest that[,] during the present academic year[,] both [B.B.] and [J.B.] have acceptable, if not better than acceptable, attendance.

Factor 5, the availability of extended family in Pittsburgh.

Mother and the [C]hildren reside with [M]aternal [G]randmother and her husband, [S.M.].

Mother's sister is also in Pittsburgh and helps with the kids. Mother's sister is very close to [M]other, and has lived in many places where [M]other has also lived.

They offer support to [M]other and to the [C]hildren.

Father has little contact with his side of the family, but considerable and very favorable contact with [S]tep-[M]other's parents and her siblings.

Factor 6, the child's sibling relationships.

The [trial court] met with the two older children and finds that they have a loving bond and are protective of their baby sister, [L.B.]. There is no request or suggestion that the three children should be separated in this custody resolution.

Factor 7, the well-reasoned preference of the child based on the child's maturity and judgment.

The child's preference, though not controlling, is a factor to be considered as long as it's based on good reasons, with more weight given to the preference of a child as that child grows older.

[The trial court's] August 27, 2018 order, which scheduled the [C]hildren's *in camera* interviews, stated in paragraph 2 – quote – Parties are cautioned against discussing custody matters with the [C]hildren or coaching the [C]hildren regarding the meeting with the judge.

However, at the interview on October 10, 2018, [J.B.] told me that [M]other told her to tell the judge about the time her step-mother took her phone from her.

[J.B.] also told the [court] that [M]other told her to tell the judge that what [J.B.] tells the [trial court] could determine whether they live with mom or live with dad.

[J.B.] said she and her mom talked about the interview as recently as the day before [the trial court] met with . . . the [C]hildren.

The [trial court] views everything the [C]hildren told [the court] with high skepticism and is concerned by the evidence that [M]other groomed the [C]hildren to perform on cue at the [*in camera*] interview.

[J.B.] said she talked with [M]other – quote – a lot – close quote – about that time that [F]ather pulled a gun on [M]other

- 9 -

and [M]other's sister. [J.B.] said – quote – I think mom told me to tell the judge about that, but I can't really remember.

[J.B.] said Mother told [her] to tell [the trial court] about all the bad things that happened in the past.

[J.B.] reported to the [trial court] that both she and [B.B.] have – quote – panic attacks – close quote.

[B.B.] testified that [S]tep-[M]other – so we're turning to [B.B.]. He testified that [S]tep-[M]other tells us that [M]other is lazy, and that dad went to jail.

[B.B.] said that [M]other told him to tell the judge that [S]tep-[M]other is mean.

The [C]hildren, being children, however, did deviate from the script at points. Elsewhere in the interview they told [the trial judge] that they had fun with [F]ather in the summer, that they go to the pool, [and] that there's lots of playtime, which is very fun.

[J.B.] said summertime with [F]ather would be even more fun if [M]other were there.

. . .

Overall the [trial court] gives little weight to much of what the [C]hildren told [it] in light of the evidence that [M]other coached them.

Factor 8, the attempts of a parent to turn the child against the other parent, except in cases of domestic violence, where reasonable safety measures are necessary to protect the child from harm.

The [trial court] makes a finding that domestic violence has occurred in the past in this case and that it does not believe that safety measures are necessary at the present time, because there is not a continuing risk under current custody arrangements.

For a child to feel equally loved, understood and cared for in the custody of both parents[,] it is essential that the parents[,] in good faith[,] exchange important information about the child.

The failure of a parent to guarantee that the other parent knows what is going on in a child's life causes that child to draw closer to the parent who knows about the issue, while that child may shut down and draw away from the parent who is in the dark.

Mother testified that she assumed that the school informed [F]ather of the bullying that [J.B.] endured at Westwood Elementary starting in early November of last year. This bullying was egregious and caused such upset with the child that that assumption on [M]other's part is totally unwarranted.

The bullying started with another student pulling [J.B.'s] hair on the playground, for which the other child got lunch detention. Mother was called about the incident, but [M]other failed to ensure that [F]ather was informed.

By early December, [J.B.] had received five noxious notes from the bully telling [ten]-year-old [J.B.] to kill herself.

Mother and the parents of the bully met with the Westwood principal, Nina Sacco, on December 6, 2018. Again, [M]other didn't reach out to [F]ather to alert him to this.

Father spent Thanksgiving with [J.B.] and remained in the dark.

The meeting on December 6th was occasioned by a December 5, 2018 note from [M]aternal [G]randmother, [G.M.], to the fifth grade teacher saying that [J.B.] had a panic or anxiety attack as a result of bullying.

After the December 6th meeting[,] the bully was suspended and moved to the other fifth grade homeroom and assigned to alternate recess.

No one shared this information with [F]ather, who spent four days at Thanksgiving vacation in Ronks, [Pennsylvania], at the Boxcar Hotel with the kids and with [S]tep-[M]om.

Again[,] he saw them at Christmas for a number of days and didn't have this information about what [J.B.] was enduring.

- 11 -

Father testified that [J.B.'s] behavior during these visits concerned him, and he thought it might be related to her starting menstruation.

Finally, on January 1, 2019, the last day of [F]ather's Christmas holiday, [J.B.] told him about the hair pulling. She did not tell him the rest of the story about the note.

During the same period[, J.B.] was experiencing urinary accidents and saw a doctor on December 11th with her grandmother. The doctor notes – quote – ongoing family stressors, and added that someone, either [J.B.] or [Maternal Grandmother], told the doctor that [J.B.] reported feeling stressed during the Thanksgiving visit with [F]ather.

There's no indication the doctor was told about the bullying. But just a week earlier[, Maternal Grandmother] told the school that the bullying was the cause of [J.B.'s] panic and anxiety attack.

The failure of [M]other to ensure that [F]ather was up to date on [J.B.'s] struggles could drive a wedge between [F]ather and [J.B.], casting [F]ather as a less significant parent, rather than as a co-equal parent who can fully comfort and protect her when [s]he is in need.

The [trial court] notes that [F]ather's ability to protect her, to protect, [J.B.] is colored by [J.B.'s] – by the evidence that [J.B.] witnessed domestic abuse earlier in her life, notably when locked in a bedroom in December of 2014, and earlier than that.

The [trial court] is mindful of this history of domestic violence between [F]ather and [M]other and the existence – and the evidence that [J.B. and B.B.] witnessed abuse.

Over the [four] years since that December 2014 altercation involving a gun[,] it remains on [J.B.'s] mind, in part[,] because [M]other apparently brings the topic up.

The [C]hildren are in therapy and should be addressing this history in that context.

Mother should also be addressing her experience of domestic abuse in counselling as well.

Conversely, the [trial court] finds no significant evidence that [F]ather sought to turn the [C]hildren against [M]other.

Factor 9, which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child, adequate for the child's emotional needs.

The [trial court] finds that both parents have a loving and stable commitment to the [C]hildren and that [M]other has been the primary parent and that [F]ather has successfully navigated his periods of partial custody.

The [trial court] repeats its concern that [F]ather has not sought to exercise additional custody afforded him under the 2017 custody order, and that that raises concerns about his efforts to maintain a consistent and nurturing relationship with the [C]hildren, who, according to the record, have asked him to . . . please come visit [them].

Factor 10, which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Father alleges that [M]other failed to seek and follow through with necessary treatment for the dental health of [L.B.] in a timely fashion and failed to communicate with him on the subject. Father maintains that he sought to have [L.B.'s] dental treatment completed sooner in order to alleviate the child's pain, but [M]other refused to consent.

This issue was the subject of a motion presented to [the trial court] in July of [2018], and[,] on second consideration[, the trial court] would not change its decision to deny the motion, this after again reviewing the exhibits, and even more exhibits than [the trial court] saw last summer.

And at that time[, the trial court] gave credence to [M]other's attorney. Mother was represented by counsel then, who submitted a letter in the motion that the matter was not an emergency and [Mother] will not consent to the extraction. The child is scheduled to see the dentist when she returns to Pittsburgh. The dentist will determine if an extraction is necessary.

- 13 -

This procedure was scheduled, and postponed. The child moved from one state to the next. The [trial court] found credible [M]other's testimony that she . . . had a date for the procedure to be performed just two days after [F]ather's custody was to commence, yet [F]ather refused to delay the start of his custody for the procedure to take place; rather, taking the suffering child out of state, away from the dentist who had been treating her and delaying the procedure to August, and ultimately September.

The communications on Our Family Wizard are elaborate. [The trial court] reviewed all of them in connection with this. There's a 34-page chain of 95 messages. Some of them are repeats, regarding – the [C]hildren's dental health.

The [trial court] does not underestimate the complexity of guaranteeing that any medical service that the parties agree on will be covered by [F]ather's insurance, but the [trial court] finds that [F]ather's tone in his communications does not assist in resolving the disputes. Rather, he is uncivil, imperious and[,] at times insulting, not furthering the best interest of the child in his communications.

Father's tone is also bordering on controlling, causing [the trial court] to have concerns that the dynamics of domestic abuse continue to undermine effective communication between the parties.

For instance, [F]ather writes to [M]other, ["]Any fit parent will follow the proper protocol, and I will continue to tell you how disrespectful and unwilling you are as a parent. Can you read? What don't you understand?["]

. . . [T]he record shows [F]ather to be highly resourceful, tech savvy, and capable of keeping up to date on medical and educational developments in the [C]hildren's life. His focus on requiring that [M]other independently provide him with this information is counter-productive and not always in the best interest of the [C]hildren, given the history of the parties.

The [trial court] in no way treats lightly [F]ather's complaint that [M]other has not kept him apprised of medical and legal custody issues, particularly his allegations that she has failed to

- 14 -

ensure that his consent was not consistently obtained — to ensure that his consent was obtained for all medical procedures.

This battle of wills and the inability of the parties to agree on important matters, like the date for little [L.B.'s] surgery, the location of it, and who would provide it, bordered on and may have crossed the line, where shared legal custody should be terminated in favor of sole legal custody.

And[, the trial court makes] that finding as a warning to both parties that communication has to improve.

The [trial court] notes that [M]other was able to answer affirmatively today that she has complied with Dr. Courtney Uselton's recommendation that [L.B.] receive regular check-ups, I believe every 90 days, and that those are occurring.

Mother needs to know that she's going to remain under a microscope to ensure that these issues are addressed, [and] that the [C]hildren's dental and health issues are receiving proper treatment.

Factor 11, the proximity of the residence of the parties.

When the parties live a great distance from each other, shared custody is obviously impossible.

At present[, F]ather testified the drive time between his house in Missouri and [M]om's in Pittsburgh is about 12 hours, and he said that flying can take anywhere from [four to seven] hours.

[Factor] 12, each party's availability to care for the child or ability to make appropriate child care arrangements.

Both parties are fully capable to make child care arrangements. Father has explored after-school options as well as in-home services, were the [C]hildren to relocate with him, and he and [S]tep-[M]other have been able to ensure that the [C]hildren are cared for during their periods of custody to date.

Similarly, [M]other relies on her parents for help and uses Open Door for after-school care for [B.B. and J.B.].

- 15 -

[Factor 13], the level of conflict between the parties and the willingness or inability to cooperate with that party.

The [trial court] finds that these are both fit parents, but in this case[,] the litigation and the conflict itself seems the greatest threat to these children's well-being.

The constant bickering and badgering is a source of harm to your children. The two of you seem to have resigned yourselves to the prospect that your communications will always be tortured.

It doesn't have to be that way. And [the trial court] would – [the trial court has] already suggested that [M]other seek counselling. [The trial court] would suggest that [F]ather seek counselling to improve his ability to communicate in a non[-]adversarial, non-accusatory, non-confrontational manner with [M]other via Our Family Wizard.

[Factor] 14, the history of drug and alcohol abuse of a party or member of a party's household.

Father testified that he once found a marijuana pipe in a kitchen drawer when he and [M]other were living together some years back. He alleged that [M]other has given inappropriate prescriptions to the [C]hildren.

Apart from [F]ather's testimony, the record contains no evidence to support the allegations.

Factor 15, the mental and physical condition of a party or member of the party's household.

The [trial court] finds this not to be an issue in this case.

The [trial court] finds no other relevant factor under [factor] 16, but notes that there is potential harm that may result from the disruption of established patterns of care and emotional bonds, those existing in this case, and that it underscores the need for continuity, stability and finality imparted to the custody arrangement.

In this case[,] it's a custody arrangement that the parties agreed to in their marriage settlement agreement in 2015 – 2017. Excuse me.

A modification of custody is not warranted merely because one parent is unhappy with the existing arrangement. The [trial courts] have repeatedly emphasized that a party requesting modification must prove that the alteration of an existing custody arrangement will be in the [C]hildren's best interest.

[The trial court] finds that [F]ather has failed to sufficiently satisfy the [trial court] that a change in custody would benefit these children, and [F]ather's modification request is denied.

N.T., 5/17/19, at 66-89.

The trial court then stated its findings with regard to the statutory custody relocation factors, pursuant to 23 Pa.C.S. § 5337(h), as follows.

Moving on to the relocation factors. Factor 1, the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, siblings and other significant persons in the child's life.

The [trial court] is concerned about the lack of testimony and evidence about the relationship and even the bond between [S]tep-[M]other, whom [F]ather married just last summer.

The [C]hildren have strong bonds with [M]other and [M]aternal [G]randmother and [S]tep-[G]randfather here in Pittsburgh, and the [trial court] is concerned about the impact of disrupting those bonds and having [F]ather and [S]tep-[M]other's role expand in the [C]hildren's lives, on this record.

Mother's testimony was undisputed that[,] when the parties separated in the summer of 2016, [] [F]ather told her she had 30 days to get out of the house with the kids, and that [M]other relayed that ultimatum to [F]ather's commanding officer.

Asked if he made these remarks[, F]ather answered[, "]I do not recall,["] twice.

There's evidence that the [C]hildren's relationship with [F]ather remains fraught, even if [M]other may be partially at fault in ways such as by retelling the domestic abuse story.

- 17 -

Factor 2, the age, developmental stage, needs of the child[,] and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

[L.B.] is a [three]-year-old and has known primary custody and not really – doesn't even recall living with [Father]. The dramatic change that is proposed by relocation of a [three]-year-old to live with [F]ather and [Step-M]other is a bridge too far for [the trial court] to endorse.

Ballwin, Missouri is a safe city, [F]ather testified, and provided the [Internet] research to support his view. Father said the [C]hildren would be able to play outside in the area where he lives and that there are none of the concerns that might restrict their outdoor play in Pittsburgh, where [M]other lives, in the Elliott neighborhood.

Father touts Oakbrook Elementary[,] where he proposes [B.B.] enroll, and Southwest Middle School, where [J.B.] would attend. He says they're far better schools than they attend here in Pittsburgh. Niche.com records students at Westwood [E]lementary are 47 percent proficient in reading and 27 proficient – 20 percent proficient in math. I think I got that right, according to the exhibits.

By contrast, the schools proposed for the [C]hildren in Ballwin receive better grades, according to [F]ather's research on School Digger.com.

However, were relocation granted, [J.B.] would be enrolling in her fifth school. She's only entering sixth grade. It would be [B.B.'s] third school[,] as he enters third grade.

Plus, there is the potential that [F]ather will be transferred in the next few years in his military duties.

[Factor] 3, the feasibility of preserving their relationship between the non-relocating party, here [M]other, that would be [M]other and the [C]hildren, through suitable custody arrangements, considering the logistical and financial circumstances of a child.

[L.B.] is just [three] years old, and FaceTime and/or phone contact, it's difficult to imagine those filling the gap in what she has come to rely on during her first [three] years of life in [M]other's custody. It's a time when an abrupt change in primary caregivers could well be traumatic to little [L.B.].

The child is accustomed to daily physical contact with [M]other and with [M]aternal [G]randmother when she's not in . . . [F]ather and [S]tep-[M]other's partial custody.

Father testified that he would ensure that the kids have contact with [M]other any time that they want, and that he will encourage contact between [M]other and the [C]hildren. Nonetheless, the [trial court] has concerns about the feasibility of preserving contact with [M]other, particularly for [three]-year-old [L.B.].

[Factor] 4, the child's preference, taking into consideration the age and maturity of the child.

This was addressed in the custody factors, specifically factor 7. It will not be repeated here.

Factor 5, whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party. We addressed this earlier in custody factor 8.

[Factor] 6, whether the relocation will enhance the general quality of life for the party seeking relocation.

Father would not be relocating. He already lives where he seeks to move the [C]hildren. So this factor, [the trial court] does not see it as applicable here.

Factor 7, whether the relocation will enhance the general quality of life for the [C]hildren, including, but not limited to, financial or emotional benefit or educational opportunity.

Father clearly has a beautiful home to offer the [C]hildren in a lovely area, a safe area, in Ballwin, Missouri.

[B.B.] appears to be a whiz, and [F]ather would love to see him academically challenged in a school of better quality than the one he believes [B.B.] attends in Pittsburgh.

The [C]hildren would be able to see more of [S]tep-[M]other's parents, who are part of the [C]hildren's lives in Ballwin. They live just 15 miles away and almost every Sunday get to see the [C]hildren, and [S]tep-[M]other's sister and niece are in the area[,] and they get together during the week.

These are all benefits, good relationships for the child — for the [C]hildren, and [F]ather would like to see them, those benefits, be available to the kids during primary custody in the school year, rather than his partial custody[,] which he has at present.

[Factor] 8, the reasons and motivation of each party for seeking or opposing the relocation.

Father testified he seeks a relocation because of concerns about [M]other's care of the [C]hildren, including truancy, physical well-being, concerns exemplified by the evidence of poor oral hygiene, causing severe tooth decay. He testified that the kids were sick too often and that they missed or canceled – missed doctor's appointments or that appointments were canceled.

Yet [F]ather testified that while he recognizes that the [C]hildren have a strong bond with [M]other, he seeks primary custody due to [M]other living with her own parents, [M]aternal [G]randparents. He indicated that [M]other's reliance on [M]aternal [G]randparents models dependency, rather than what he would like to see modelled with the [C]hildren living primarily with him and [S]tep-[M]other.

The [trial court] finds [F]ather's motivations to be pure. Likewise, the [trial court] finds that [M]other's reasons for opposing the proposed relocation to be pure as well. They both love their children and both want to spend as much time as possible with them.

However, the [trial court] notes, again, that [F]ather has not once[,] in [two] years[,] exercised the additional custody and time in Pittsburgh that the 2017 agreement affords him. He's not

once come to Pittsburgh and asked to exercise that additional custody time.

Factor 9, the present or past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child – to the [C]hildren or an abused party. The [trial court] fully addressed this in the custody factors, notably custody factor 2.

[Factor] 10, any other factor affecting the best interests of the [C]hildren.

The [trial court] finds it highly appropriate and is grateful that [F]ather concluded his rebuttal testimony today talking about the individual gifts and interests that each of these [C]hildren has, rather than focusing on historical discord between these parties.

I encourage you to keep that hopeful attitude going forward, to avail yourselves separately of counselling, to improve your ability to engage in productive rather than counter-productive communication on the Our Family Wizard app.

The relocation petition is denied.

N.T., 5/17/19, at 89-96.

Following the conclusion of the hearing on May 17, 2019, the trial court entered the order that provided that legal and physical custody of the Children would continue to be governed by the provisions of Section 4 of the MSA dated February 15, 2017, and denied Father's request to relocate with the Children to Missouri.

On June 13, 2019, Father filed a notice of appeal, along with a concise statement of errors complained of on appeal. In his brief on appeal, Father raises the following issues:

I. Whether the trial court committed an abuse of discretion and error of law by conducting the trial in a manner that demonstrated

bias and partiality in favor of Mother, and/or was prejudicial to Father when the trial court assumed the role of advocate for *pro se* Mother, forced time constraints on Father's case-in-chief, and exhibited bias against Father for owning a gun and being a member of the United States Marine Corps?

II. Whether the trial court committed an abuse of discretion and an error of law by failing to award Father primary custody of the minor children by misapplying and/or failing to analyze the custody factors set forth in 23 Pa.C.S.A. [§] 5328(a), when its decision ignored and was against the weight of the evidence presented at trial, and was contrary to the best interests of the [C]hildren?

III. Whether the trial court committed an abuse of discretion and an error of law by denying Father's relocation request by misapplying and/or failing to analyze the custody relocation factors set forth in 23 Pa.C.S.A. [§] 5337(h), when its decision ignored and was against the weight of the evidence presented at trial, and was contrary to the best interests of the [C]hildren?

Father's Brief at 7.

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.

§ 5321-5340, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

We have stated:

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006), *quoting*, **Jackson v. Beck**, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In **M.A.T. v. G.S.T.**, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we stated the following regarding an abuse of discretion standard.

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

**Id.** at 18-19 (quotation and citations omitted).

With any custody case decided under the Act, the paramount concern is the best interests of the child.

Father's first issue contends that the trial court "conducted the trial in a manner that demonstrated bias and partiality in favor of Mother [and against] Father." Father's Brief at 7. This claim has three facets. According to Father, the trial court erred because it: 1) equally divided the trial time between the parties, but actually afforded Mother more time overall; 2) questioned the witnesses (Mother and Father) itself, at times, in a matter where Mother was

acting *pro se*; and 3) exhibited bias against Father for being a member of the United States Marine Corps and possessing a gun. Father's Brief at 14.

With regard to the first sub-issue, we have carefully reviewed the record in this matter and the examples provided in Father's brief at pages 15-23. Simply stated, we find nothing to support Father's claim that the trial court inappropriately allocated the parties' time in the hearings to work to Mother's favor. There is nothing in the present record to demonstrate that the trial court in any way held the parties to any legal procedure other than that which is appropriate in a custody hearing, of which both parties had notice. The trial court afforded both parties an opportunity to present evidence that pertained to the statutory custody best interest and relocation factors to the trial court. The trial court acted to move the case along in the interest of its own case management. We reject Father's argument that the trial court acted improperly and, thus, abused its discretion. We do not find bias in the trial court's management of its time in this custody case, where the trial court properly noted that it would need to devote its consideration to all of the statutory best interest and relocation factors, and the presentation of evidence with regard to those factors would take considerable time. *See* N.T., 5/16/19, at 65-66. Accordingly, we find that the trial court did not abuse its discretion in its allocation of the time at the custody hearings.

Moreover, regarding Father's contention that the trial court improperly assumed the role of advocate for Mother, this Court has stated:

[A *pro se* litigant] is not entitled to any particular advantage because [] he lacks legal training. [A]ny layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing.

*Rich v. Acrivous*, 815 A.2d 1106, 1108 (Pa. Super. 2003) (quotations and citations omitted). However, we have explained:

It is well settled that a trial court always has the right, and sometimes even the duty[,] to interrogate witnesses, in order to clarify evidence, or to elicit new information that is necessary to ensure a fair trial. A new trial is required, therefore, only when the trial judge's questioning amounts to an abuse of discretion. Because a charge of this nature is of the most serious type, however, the record must clearly show prejudice, bias, capricious disbelief or prejudgment before an abuse of discretion will be found.

*Fleck v. Durawood Inc.*, 529 A.2d 3 (Pa. Super. 1987) (quotations and citations omitted).

We have carefully reviewed the portion of the notes of testimony to which Father objects as improper intervention on the part of the trial court on behalf of Mother, who was proceeding *pro se*. **See** Father's Brief at 24-27. We discern no abuse of the trial court's discretion in questioning the witnesses, as the trial court was seeking to clarify the record concerning whether it was in the Children's best interests to grant Father's custody modification petition and request for relocation. We have carefully reviewed the record, and we conclude that the trial court did not exhibit partiality, prejudice, bias, or ill will toward Father in its questioning of the parties.

Finally, we have carefully reviewed the portion of the notes of testimony to which Father objects on the basis that the trial court exhibited improper

bias against him for possessing a gun and being a member of the United States Marine Corps. *See* Father's Brief at 27-30. Father complains that the trial court ignored documented evidence and Mother's own admissions of her physical maltreatment of him, and, instead, improperly focused on Mother's allegations that Father had exhibited a gun at her in December of 2014 during a domestic dispute. Father's Brief at 28. We can discern no impropriety on the part of the trial court. We find no merit to Father's contention that the trial court was biased against him because he is a member of the United States Marine Corps and possessed a gun.[6]

Within Father's second numbered appellate claim, Father argues that the trial court abused its discretion and committed an error of law in failing to award him primary physical custody of the Children and by misapplying and/or failing to analyze the section 5328(a) custody best interest factors. Father's Brief at 30. Father contends that the trial court's decision ignored and is against the weight of the evidence and is contrary to the Children's best interest. *Id.*

_____

[6] In his brief, Father asserts that the trial court violated a Federal statute at section 3938 of the Servicemembers Civil Relief Act, 50 U.S.C. § 3938(b). Father's Brief, at 28-29. Father waived this issue by failing to preserve it in his concise statement and his statement of questions involved portion of his brief. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the Statement of Questions Involved in his or her brief on appeal); Pa.R.A.P. 302(a) (issues not presented to the trial court may not be presented for the first time on appeal).

In his first sub-issue, Father argues that, despite the trial court's finding that the Children are in no danger with either parent, the trial court erroneously determined that § 5328(a)(2) was favorable to Mother. Father's Brief at 32. He claims that the trial court erred in relying on the past abuse allegation from 2014, contending that the evidence before the court did not support a finding that Father was the sole aggressor. *Id.*

In his second sub-issue, Father argues that the trial court determined that § 5328(a)(3) was favorable to Mother, despite overwhelming evidence that the needs of the Children are not met while they are in Mother's care. Father emphasizes that L.B. suffered from tooth decay, J.B. suffered from bullying, J.B.'s grades are in decline, and J.B. and B.B., the two school-aged children, are repeatedly tardy and absent from school while in Mother's care. *Id.* at 33-34.

In his third sub-issue, Father contends that the trial court erroneously determined that § 5328(a)(4) favored Mother, despite Father's presentation of overwhelming evidence of his ability to provide stability and continuity in the Children's education, family life, and community life. *Id.* at 34. Father complains that the trial court ignored his documented evidence of superior schools and a safer neighborhood for the Children in Missouri, and his photographic evidence of his home and family. *Id.* at 35. He asserts that the trial court erroneously pointed to his military career and stated that the Children should not be moved to yet another school, and concluded that J.B.'s

bullying situation has been addressed by J.B.'s school. *Id.* Father alleges that he offered the better home for the Children with regard to this factor. *Id.* at 36.

In his fourth sub-issue, Father contends that the trial court interpreted § 5328(a)(8) to remain favorable to Mother, despite overwhelming evidence of Mother's attempts to turn the Children against Father. *Id.* at 36. Father complains that: the trial court found that Mother coached the Children for their October 10, 2018 interview with the court; found Mother attempted to blame J.B.'s urinary accidents on her recent visit with Father; and, found Mother routinely fails to communicate critical information to Father regarding the health and wellbeing of the Children. *Id.* Father argues that the court should have weighed this factor in his favor. *Id.* at 37-38.

In the fifth sub-issue, Father argues that the trial court erroneously found § 5328(a)(10) favored Mother, despite evidence that he is the parent more likely to attend to the daily physical, emotional, developmental, and educational and special needs of the Children. *Id.* at 38-40.

None of these claims have merit. Father challenges the trial court's conclusions and assessments and seeks to have this Court re-find facts, re-weigh evidence, and re-assess credibility to his view of the evidence. After a careful review of the record in this matter, we find that the trial court, in comprehensive fashion, considered and weighed all relevant custody best interest factors. We will not disturb the trial court's findings of fact and

determinations regarding credibility and weight of the evidence absent a finding that the trial court committed an abuse of its discretion. *See C.R.F.*, 45 A.3d at 443. As we stated in *King v. King*:

> It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, based on the evidence presented, given due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion. . . .

*King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (citations and some quotations omitted).

The trial court carefully and appropriately considered each custody best interest factor and the trial court's conclusions are supported by the record. Thus, we do not find an abuse of discretion here.

In his third issue on appeal, Father contends that the trial court abused its discretion and committed an error of law in denying his relocation request by misapplying and/or failing to analyze the section 5337(h) custody relocation factors. Father's Brief at 40. Father contends that the trial court's decision ignored and is against the weight of the evidence and is contrary to the Children's best interest. *Id.* In the first portion of his third issue, Father argues that the trial court erred in its analysis of the Children's relationships with the parties' household members as indicated in § 5337(h)(1). *Id.* In particular, Father complains about the trial court's assessment of the Children's bonds with Stepmother and with their maternal grandparents. *Id.* at 40-41.

In the second portion of his third issue, with regard to 23 Pa.C.S. § 5337(h)(2), Father argues that the trial court erred in its analysis of the impact of the relocation on the Children. *Id.* at 41. Father contends that the trial court ignored the overwhelming evidence that ten-year-old J.B. has suffered from bullying and a decline in grades in school, and that she would benefit from a relocation with Father to have a better school in a better neighborhood. *Id.* Father also urges that the trial court erroneously found that three-year-old L.B. would be negatively impacted by not being with Mother, without evidence to support this conclusion. *Id.* at 41-42. He asserts that the trial court ignored the fact that L.B. would benefit from relocation by receiving the medical and dental care she needs. *Id.* at 42. Father also asserts that eight-year-old B.B. would benefit from attending better schools that would cultivate his academic endeavors. *Id.*

In his final portion of his third issue, Father contends that the trial court ignored compelling evidence that he presented in relation to § 5337(h)(7) that the Children would attend better schools and live in a safer neighborhood as a result of relocating to live with him. *Id.* He asserts that he presented evidence that each of the Children would have their own room. *Id.* Father states that J.B. and B.B. share a room in Mother's home, which he urges is awkward, as J.B. has entered puberty and begun menstrual periods. *Id.* at 43. Father argues that the evidence was overwhelming that the Children

would benefit from the relocation and that their quality of life would improve significantly. *Id.*

Again, Father's third claim simply asks this Court to re-weigh the evidence in his favor. Yet, as explained above, we cannot reverse a trial court's weight of the evidence and credibility determinations unless there has been an abuse of discretion. In light of the trial court's careful and thorough factual finding and balancing, there has been no abuse of discretion here. As such, Father's final claim on appeal fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2020